FILED IN CHAMBERS
U.S.D.C. Atlanta

MAR 18 2008

JAMES N. HATTEN, Clerk

By _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

J.W. LEDFORD, JR.,

        Petitioner,

v.

FREDRICK HEAD, Warden, Georgia
Diagnostic and Classification
Prison,

        Respondent.

CIVIL ACTION NO.

1:02-CV-1515-JEC

### ORDER AND OPINION

The Court previously granted petitioner an evidentiary hearing to determine whether petitioner is mentally retarded. (Order [38].) The Court held the hearing on April 9-11, 2007. (Hearing Tr. [80], [83], [84].) After reviewing all of the evidence presented at the hearing, as well as the parties' post-hearing briefs, the Court finds that petitioner is not mentally retarded under Georgia law.

### BACKGROUND

In 1992, petitioner was convicted on charges of malice murder, armed robbery, burglary, and kidnapping in the Superior Court of Murray County, Georgia. He was sentenced to death for the murder conviction.[1]

---

[1] He was also given a life sentence for the armed robbery of Harry Buchanan Johnston, Jr., a consecutive life sentence for the

Georgia law has prohibited execution of the mentally retarded since 1988.  *See* O.C.G.A. § 17-7-131(j).  Before his trial, petitioner was evaluated by a court-appointed expert who determined that he had a "borderline" IQ in the 70 to 80 range.  However, petitioner's trial counsel did not further investigate whether petitioner was mentally retarded, and did not present any evidence or argument on mental retardation in the sentencing phase of the trial.

Petitioner's trial attorneys appealed his conviction to the Georgia Supreme Court, which affirmed the conviction and sentence. *Ledford v. State*, 264 Ga. 60, 439 S.E.2d 917 (1994).  The attorneys then filed a petition for writ of certiorari in the United States Supreme Court, which denied the petition.  *Ledford v. Georgia*, 513 U.S. 1085, *reh'g denied*, 513 U.S. 1199 (1995).  The attorneys did not raise the mental retardation issue in either of those proceedings.

Petitioner subsequently obtained new counsel and filed a state habeas corpus petition.  Petitioner asserted numerous grounds for relief in the state habeas court, including:  1) a claim for ineffective assistance of counsel based on trial counsel's failure to investigate and present evidence of mental retardation; and 2) a

---

armed robbery of Antoinette Logan Johnston, a 20-year sentence for burglary to run concurrent with the life sentence imposed for the armed robbery of Antoinette Logan Johnston, and a 20-year sentence for kidnapping to run concurrent with the life sentence imposed for the armed robbery of Antoinette Logan Johnston.

AO 72A
(Rev.8/82)

claim that Georgia law prohibits petitioner's execution because he is mentally retarded.   In support of these claims, petitioner presented affidavits of Drs. Herendeen, Fiester, and Zimmermann showing that petitioner's IQ is below 70, and that he is mentally retarded.   The state habeas court excluded these affidavits without explanation, and rejected petitioner's ineffective assistance and mental retardation claims.[2]   The Georgia Supreme Court denied petitioner's application for a certificate of probable cause to appeal the state habeas court's decision.

Petitioner then filed the present petition for writ of federal habeas corpus.   (Petition [1].)   In his federal petition, petitioner asserted a Sixth Amendment claim for ineffective assistance of counsel based on trial counsel's failure to investigate and present evidence of mental retardation.   (Amended Petition [17].)[3] Petitioner also alleged that his execution would violate the Eighth Amendment, as he is mentally retarded.   (*Id.*)

Petitioner sought leave to conduct discovery on several issues, including his mental retardation claims.   (Petitioner's Mot. for

---

[2]  The state habeas court excluded Dr. Zimmermann's supplemental affidavit in its entirety on the ground that petitioner failed to provide 10 days notice to respondent, as required by O.C.G.A. § 9-14-48(c).

[3]  Petitioner filed an amended petition [17] on February 28, 2003.

3

Leave to Conduct Discovery [19]).  The Court denied the motion, but indicated in its Order that it was troubled by the state habeas court's complete exclusion of the affidavits submitted by petitioner. The Court requested briefing from the parties to determine whether to grant an evidentiary hearing on the mental retardation issue.  After reviewing the record and the arguments of the parties, the Court found that an evidentiary hearing was warranted.  (Order [38].)

The Court held the evidentiary hearing on April 9-11, 2007. (Hearing Tr. [80], [83], [84].)  The Court gave petitioner the opportunity at the hearing to present any evidence that was relevant to his mental retardation claims.  Following the hearing, the Court directed the parties to submit post-hearing briefs.  Briefing concluded on September 14, 2007.  Having reviewed all of the evidence presented at the hearing, as well as the post-hearing briefs, the Court concludes that petitioner is not mentally retarded.

## DISCUSSION

### I.   Standard of Review

The AEDPA "'establishes a highly deferential standard for reviewing state court judgments.'"  *McNair v. Campbell,* 416 F.3d 1291, 1297 (11th Cir. 2005)(quoting *Parker v. Sec'y for Dept. of Corr.,* 331 F.3d 764, 768 (11th Cir. 2003)).  A state court's factual determinations are "presumed correct unless rebutted by clear and convincing evidence."  *Id.*  Moreover, the Court cannot grant habeas

4

relief unless the state court's decision was:  1) contrary to, or involved an unreasonable application of, clearly established federal law; or 2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254 (d).

The deference that is mandated by the AEDPA, however, does not require "abandonment or abdication of judicial review."  *Jones v. Walker,* 496 F.3d 1216, 1226 (11th Cir. 2007).  The presumption of correctness that is afforded state fact findings may be overcome by clear and convincing evidence.  *Id.*  In addition, when § 2254(d) is satisfied, no deference is due the state court decision.  *Panetti v. Quarterman,* 127 S.Ct. 2842, 2858 (2007).

In this case, the state habeas court found that petitioner was not mentally retarded, and that trial counsel's failure to raise or investigate the issue of mental retardation was reasonable.  (State Habeas Order at 26, 57.)  In support of these findings, the court stated that:

> after comprehensive psychological testing and evaluation, both Dr. Perri (the court-appointed expert) and Dr. Herendeen (the defense expert) found that [petitioner's] IQ fell within the borderline and low average range of intelligence and concluded that [petitioner] was not mentally retarded.

(*Id.* at 26.)  Respondent suggests that these findings are entitled to deference under the AEDPA.  (Respondent's Br. [91] at 24.)

As the Court indicated in its previous order, the evidence in

5

the record does not support the state habeas court's findings on mental retardation. (Order [38] at 10.) Although both Dr. Perri and Dr. Herendeen performed some type of intelligence testing, neither expert was asked or offered to make a specific determination on the issue of mental retardation. Certainly neither of the experts addressed the relevant standard for mental retardation under Georgia law, which defines mental retardation as follows:

> "Mentally retarded" means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period.

O.C.G.A. § 17-7-131(a)(3).[4]

The Court thus finds that AEDPA § 2254(d) has been satisfied as to the mental retardation issue. Accordingly, the Court will determine *de novo* whether petitioner is mentally retarded, based on the evidence presented at the evidentiary hearing. *See Panetti,* 127 S.Ct. at 2858. In making this determination, the Court will consider all of the evidence submitted by petitioner.[5]

---

[4] In addition, the habeas court summarily "deemed inadmissible" three expert affidavits opining that petitioner is mentally retarded. (Order on Admissibility of Evidence, attached to Respondent's Answer to Amended Petition [18] at Ex. 40.) Among the excluded evidence was an affidavit in which Dr. Herendeen testified that his prior evaluation of petitioner was not accurate because he did not have sufficient time to assess petitioner's mental functioning. (Herendeen Aff., attached to Respondent's Answer [18] at Ex. 43.)

[5] Although § 2254(e) bars an evidentiary hearing when a habeas petitioner has not been diligent in his efforts to present a claim in

6

## II.  **Burden of Proof**

The parties agree that petitioner has the burden of proving that he is mentally retarded, but they disagree as to the standard of proof that is applicable to his mental retardation claim.  Respondent urges the Court to apply the "beyond a reasonable doubt" standard specified by Georgia statute.  *See* O.C.G.A. § 17-7-131(c)(3). Petitioner notes that Georgia is the only state to impose such a stringent burden.  (Petitioner's Br. [88] at 3.)  According to petitioner, Georgia's "uniquely harsh" standard violates the Eighth and Fourteenth Amendments.  (*Id.* at 4.)

The Supreme Court recognized in *Atkins* that there might be "serious disagreement . . . in determining which offenders are in fact retarded."  *Atkins v. Virginia*, 536 U.S. 304, 317 (2002).  The Court specifically left to the states "the task of developing appropriate ways" to resolve that disagreement.  *Id.* (citing *Ford v. Wainwright*, 477 U.S. 399 (1986)).  Imposing a stringent burden of proof on a defendant who claims to be mentally retarded is a legitimate means of implementing the Supreme Court's mandate.[6]  *See*

---

state court, the AEDPA does not limit the evidence that the Court may consider once it determines that an evidentiary hearing is authorized and warranted.  Neither does the AEDPA require petitioner to show "diligence" with respect to every piece of evidence he offers in support of his claim.

[6]  There is no language in *Atkins* to suggest that Georgia's standard is constitutionally impermissible.  In fact, the Supreme

AO 72A
(Rev.8/82)

*Head v. Hill*, 277 Ga. 255, 261-62, 587 S.E. 2d 613, 621-22 (2003) (holding that Georgia's statute is constitutional) and *Ferrell v. Head*, 398 F.Supp. 2d 1273, 1295 (N.D. Ga. 2005)(Thrash, J.) (holding same).

In support of his argument to the contrary, petitioner relies on the Supreme Court's decision in *Cooper v. Oklahoma*, 517 U.S. 348 (1996). In *Cooper*, the Court held that a state statute requiring a defendant to prove his incompetence to stand trial by "clear and convincing" evidence violated the defendant's right to due process. *Id.* at 355-56. The Court noted that an incompetent defendant is by definition unable to exercise the rights deemed essential to a fair trial, including communicating with counsel, confronting his accusers, and deciding whether to waive his privilege against self-incrimination by taking the witness stand. *Id.* at 355, 364. The Court thus reasoned that imposing the burden of a criminal trial on a defendant who has demonstrated that he is more likely than not incompetent would threaten the basic fairness of the trial itself. *Id.* at 355-56.

Petitioner notes that a number of courts have applied the *Cooper* analysis to find that a mentally retarded defendant cannot be

---

Court cited Georgia's statute with approval. *Atkins*, 536 U.S. at 313-14 (noting that Georgia was the first state to prohibit the execution of the mentally retarded).

constitutionally required to prove mental retardation by anything more than a preponderance of the evidence. (Petitioner's Br. [88] at 5.) However, the Court is not persuaded by the analogy to *Cooper*. There are significant differences between incompetence to stand trial and mental retardation. As the Supreme Court recognized in *Atkins*, the mentally retarded "frequently know the difference between right and wrong and are competent to stand trial." *Atkins*, 536 U.S. at 318. Accordingly, the mentally retarded "should be tried and punished when they commit crimes." *Id.* at 306. This legal distinction suggests that mental retardation differs constitutionally from incompetence to stand trial. *See People v. Vasquez*, 84 P.3d 1019, 1023 (Colo. 2004)("the concerns that the Court outlined in *Cooper* are simply not implicated here").

A second distinction relates to the risk of malingering. *See State v. Grell*, 212 Ariz. 516, 525, 135 P.3d 696, 705 (2006). A defendant who successfully feigns incompetence is not required to submit to trial at that time. *Id.* Generally, however, an incompetent defendant is sent to a mental health facility for treatment and further examination of his competency. *Id.* The defendant is most often either restored to competency or discovered to be malingering. *Id.* In the event of either occurrence, the defendant is subject to trial and punishment, including the death penalty, if appropriate. *Id.* On the other hand, once a court

9

determines that a defendant is mentally retarded, that defendant may never suffer the punishment of execution, even if he is later discovered to have been malingering. *Grell,* 212 Ariz. at 525, 135 P.3d at 705.

A better comparison lies between a claim of mental retardation as a bar to execution and a claim of insanity as a bar to execution. Both claims relieve a guilty person of at least some of the statutory penalty to which he would otherwise be subject. In fact, the *Atkins* Court cited its decision in *Ford v. Wainwright,* which addressed the constitutional prohibition on executing the insane. *Atkins*, 536 U.S. at 317 (citing *Ford v. Wainwright,* 477 U.S. 399 (1986)). In *Ford*, the Supreme Court expressly recognized that "some high threshold showing on behalf of the prisoner [may] be found a necessary means to control the number of non-meritorious or repetitive claims of insanity." *Ford*, 477 U.S. at 417. *See also Leland v. Oregon*, 343 U.S. 790, 798-99 (1952)(approving application of the beyond a reasonable doubt standard to insanity claims). The same can be said of mental retardation claims. *Atkins,* 536 U.S. at 317.

The Court thus rejects petitioner's argument that Georgia's "beyond a reasonable doubt" standard is unconstitutional. *Accord Grell*, 135 P.3d at 705 (finding the clear and convincing evidence standard constitutional as applied to mental retardation claims) and *Vasquez*, 84 P.3d at 1023 ("neither the procedural rule of *Cooper* nor

AO 72A
(Rev.8/82)

the substantive restriction of *Atkins* limits Colorado's discretion in allocating and quantifying the appropriate burden of proof"). Nevertheless, the Court will consider whether petitioner has proved his mental retardation by a preponderance of the evidence. If not, he cannot meet the reasonable doubt standard *a fortiori*. If so, the Court will then consider whether the evidence is sufficient to show mental retardation beyond a reasonable doubt.

## III. <u>Georgia Law on Mental Retardation</u>

Georgia defines "mentally retarded" as "significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period."   O.C.G.A. § 17-7-131(a)(3).   *See also Stripling v. State*, 261 Ga. 1, 4, 401 S.E.2d 500, 504 (1991) (discussing Georgia's definition of "mentally retarded").  The Court finds that petitioner has not proven, by a preponderance of the evidence, that he meets this definition.

### A.   **Significantly Subaverage Intellectual Functioning**

In Georgia, significantly subaverage intellectual functioning generally requires an IQ score of 70 or below.  *Stripling*, 261 Ga. at 4, 401 S.E.2d at 504.  *See also Head v. Stripling*, 277 Ga. 403, 404, 590 S.E.2d 122, 124 (2003) ("the generally accepted IQ score for an indication of mental retardation is approximately 70 or below").  The record contains the following IQ scores for petitioner:

11

| Test | Examiner | Date | Score |
|------|----------|------|-------|
| Shipley Scale | Dr. Herendeen | 1992 | 85 |
| WAIS-R | Dr. Perri | 1992 | 77 |
| Culture Fair | GDCP[7] | 1992 | 86 |
| Kaufman | Dr. Zimmermann | 1998 | 66 |
| WAIS-III | Dr. Zimmermann | 1998 | 69 |
| WAIS-III | Dr. King | 2007 | 79 |

Petitioner contends that the Court should not consider his results on the Shipley Scale or the Culture Fair in determining his IQ. (Petitioner's Reply [95] at 10.) The experts who testified at the evidentiary hearing agreed that neither test is a reliable measure of intellectual function. (Hearing Tr. at 233-34, 260, 279, 307-08, 472-73; Petitioner's Ex. 11.) The Court thus disregards petitioner's score of 85 on the Shipley Scale and his score of 86 on the Culture Fair in evaluating petitioner's mental status.

The Court also disregards Dr. Zimmermann's IQ scores of 66 and 69. Reviewing Dr. Zimmermann's raw data, it is impossible to verify the accuracy or reliability of his scores because the written test that he administered is illegible and portions of the test are missing pages. (Hearing Tr. at 377-78.) On other portions of the test, Dr. Zimmermann failed to record petitioner's responses. (*Id.*

---

[7] The GDCP refers to the Georgia Diagnostic and Classification Prison in Jackson, Georgia. (Petitioner's Ex. 11.)

AO 72A
(Rev.8/82)

at 379-81.)  Dr. Zimmermann acknowledged that he did not record all of petitioner's responses, and that it is "extremely" difficult even for him to read the responses that he did record.  (*Id.*)  He conceded further that he failed to record whether he had asked the mandatory "query" questions that are required for accurate IQ scoring.  (*Id.* at 380-82.)

Petitioner's expert, Dr. Tasse, testified that it is standard practice, when administering an IQ test, to record all of a subject's responses.  (*Id.* at 112.)  He stated that queries should also be documented.  (Hearing Tr. at 112.)  The reason it is important to record all responses and queries is that the examiner typically scores an IQ test after the testing is completed.  (*Id.* at 113.)  To accurately score an IQ test, it is essential that the examiner be able to go back and read the responses that were provided.  (*Id.*)  It is also important in a forensic setting, so that an examiner's IQ scores can be analyzed and verified.  (*Id.*)  Dr. Zimmermann's failure to appropriately record queries and responses thus bears directly on the reliability and accuracy of the IQ tests that he administered to petitioner in 1998.  (*Id.* at 112, 380-32.)

Petitioner contends that Dr. Zimmermann's documentation errors are inconsequential because respondent had "ample means and opportunity to cross-examine Dr. Zimmermann about his methodology and results."  (Petitioner's Reply [95] at 11.)  The problem is that Dr.

13

Zimmermann did not perform well under cross-examination. (Hearing
Tr. at 380-88.) Although it is difficult to analyze Dr. Zimmermann's
raw data, Dr. Zimmermann's testimony on cross-examination suggests
that he misscored several items, which would have raised petitioner's
IQ score. (*Id.*) On the WAIS-III, any error was potentially
significant because Dr. Zimmermann gave petitioner a score of 69,
just below the level generally considered to indicate mental
retardation.

On the other hand, the Court found that Dr. King was credible as
to his evaluation of petitioner's intellectual functioning. Dr.
King's IQ score was within a few points of the score obtained in 1992
by the court-appointed expert, Dr. Perri. (Respondent's Ex. 1.) Dr.
King was able to explain in detail how he obtained the score and his
raw data can be reviewed and critiqued. (*Id.*) The Court thus
credits the IQ score of 79 that petitioner obtained on the WAIS-III
administered by Dr. King in 2007.

The Court also credits the 77 IQ score that was elicited by Dr.
Perri in 1992 in preparation for petitioner's trial. (*See* Order [38]
at 10.) Dr. Perri was appointed by the court to evaluate petitioner.
(*Id.*) He had no discernible bias or interest in the case, and
neither party presented any evidence to suggest that his evaluation
was not reliable or accurate.

14

AO 72A
(Rev.8/82)

### 1.  The Flynn Effect

Petitioner's IQ scores of 77 and 79 are significantly higher than the cut-off for mental retardation recognized by Georgia courts. *See Stripling*, 277 Ga. at 404, 590 S.E.2d at 124.  However, petitioner argues that his IQ scores should be reduced to account for the "Flynn effect." (Petitioner's Br. [88] at 9-12.)  The Flynn effect has to do with the problem of "norming" IQ results. (Hearing Tr. at 35.)  An IQ test is typically normed so that a score of 100 represents the average, and every 15 points represents one standard deviation from the average. (*Id.* at 48-49.)  "Significantly sub-average" is defined as two standard deviations below the norm, which ordinarily is an IQ score of 70 or below. (*Id.*)

James Flynn is a political scientist who has studied IQ scores. (*Id.* at 105.)  He has determined in his studies that IQ scores increase at an average rate of 0.3 points per year from the time that an IQ test is normed. (*Id.* at 42.)  The premise of the "Flynn effect" is that IQ tests that are not renormed to take rising IQ scores into account will overstate a testtaker's score. (Hearing Tr. at 48-49.)  To illustrate, assume that an IQ test is normed in 1990. At the time it is normed, a score of 100 is the average or norm, and a score of 70 is "significantly subaverage" because it is two standard deviations below the norm.  Assuming IQ gains of 0.3 points per year, by 2000 the average score on the test will be 103, and a

15

score of 73 will be "significantly subaverage" because it is two standard deviations below the norm.

The WAIS-R was normed in 1980 and administered to petitioner in 1992.[8] (Petitioner's Br. [88] at 12.)  The WAIS-III was normed in 1995 and administered to petitioner in 2007.  (*Id.*)  Thus, twelve years passed between the date each test was normed and the date it was administered to petitioner.  (*Id.*)  Applying the Flynn effect, the average IQ on the WAIS-R and the WAIS-III would have risen to approximately 104 by the time petitioner took both tests.  Petitioner argues, accordingly, that four points should be deducted from his score of 77 on the WAIS-R and 79 on the WAIS-III.  (*Id.*)

The Court was not impressed by the evidence concerning the Flynn effect.  There was testimony at the hearing that the Flynn effect is a "generally recognized phenomenon," but experts for both petitioner and respondent agreed that it is not used in clinical practice to reduce IQ scores.  (Hearing Tr. at 320-21, 439.)  Both Dr. King and Dr. Zimmermann testified that they have never seen it utilized except in capital cases.  (*Id.*)  Dr. Zimmermann specifically stated: "I don't think I've seen anybody who is doing this in clinical practice."  (*Id.* at 320-21.)  Dr. King added: "I've never seen it

---

[8]  According to Flynn's article, the WAIS-R was normed in 1978. (Petitioner's Ex. 12.)  Because petitioner states that the WAIS-R was normed in 1980, the Court will use that date to assess the impact of the Flynn effect.

AO 72A
(Rev.8/82)

done except in capital litigation cases." (*Id.* at 439.) The Court is hesitant to apply a theory that is used solely for the purpose of lowering IQ scores in a death penalty context.

In addition, the evidence is in dispute concerning the gains observed on the particular tests that are at issue in this case, namely the WAIS-R (1980) and the WAIS-III (1995). The 0.3 per year deduction that petitioner advocates is the result of an average of 12 estimates of the rate of IQ gains that Flynn observed on various tests between 1972 and 2002. (James Flynn, *Tethering the Elephant* at 176, attached to Flynn Aff. at Petitioner's Ex. 12.) Dr. Tasse acknowledged at the hearing that the actual rate of IQ gain varies from test to test. (Hearing Tr. at 106.) Dr. Tasse further conceded that the WAIS-III, in particular, does not appear to be subject to the 0.3 rate of IQ gain. (*Id.* at 59.)

Flynn's data suggests that the yearly gain on the WAIS-III is closer to 0.17 than to 0.3. (*Tethering the Elephant* at 177.) Flynn believes that this discrepancy demonstrates that the WAIS-III was misnormed. (Flynn Aff. at ¶ 13.) But there is serious disagreement about whether that is the case. (*Id.* at ¶¶ 4, 12, 18.) Dr. Tasse testified that the experts are not yet certain what explains the discrepancy. (Hearing Tr. at 59.) Petitioner concedes that Dr. Flynn's explanation (that the WAIS-III was misnormed) is not yet accepted within the scientific community. (Petitioner's Br. [88] at

17

10-11, n. 9.)   It may be that the rate of IQ gain has slowed since 1978, or that the WAIS-III is a better test.   (Hearing Tr. at 59; Flynn Aff. at ¶ 4.)

Petitioner relies heavily on the fact that the WAIS-III technical manual, published by Harcourt, refers to the "real phenomenon of IQ score inflation over time." (Petitioner's Br. [88] at 9.)   This reference merely explains why tests are periodically renormed.   Flynn's research unquestionably supports the proposition that IQ tests should periodically be renormed and that psychologists should use the most recently normed tests.   It does not necessarily support the practice of deducting an average number of points from an IQ score obtained after administering the most recently normed version of an IQ test.   And in fact, Harcourt does not recommend deducting points from an IQ test to "factor in" the Flynn effect. (Hearing Tr. at 107, 360.)

This discussion is for the most part academic, however, because even if the Court deducts four points from petitioner's scores of 77 and 79, petitioner's scores of 73 and 75 are still above the score of 70 that is generally considered to demonstrate "significantly subaverage" intellectual functioning under Georgia law.   *See* *Stripling*, 277 Ga. at 404, 590 S.E.2d at 124.

### 2.   Standard Error of Measurement

The significance of the Flynn effect in fact depends on a

18

further deduction from petitioner's IQ score to account for the "standard error of measurement." (Petitioner's Br. [88] at 12.) Dr. Tasse testified that IQ tests generally have a standard error of measurement of plus or minus five points. (Hearing Tr. at 30.) What this means is that, in a person with a 70 IQ, there is a 95% confidence that the IQ is actually between 65 and 75. (*Id.* at 31.) If one applied the Flynn effect, along with the standard error of measurement to petitioner's scores, an examiner could say with 95% confidence that petitioner's IQ is between 68 and 78, using Dr. Perri's scores, or between 70 and 80, using Dr. King's scores. According to petitioner, this places him in the "range" of a mentally retarded person. (Petitioner's Br. [88] at 13-14.)

The Court recognizes that "standard error of measurement" is a generally accepted scientific concept. (*See* Hearing Tr. at 32.) But the standard error of measurement simply means that an IQ score can overestimate or underestimate a person's true level of intellectual functioning. (*Id.* at 64.) There is no basis for assuming that the standard error of measurement lowered petitioner's score enough to meet Georgia's mental retardation standard. *See Green v. Johnson,* 2007 WL 951686 *12 (E.D. Va. 2007)(finding that a downward adjustment in petitioner's IQ score to account for the standard error of measurement would be speculative) and *Walton v. Johnson,* 440 F.3d 160, 178 (4th Cir. 2006)(noting that petitioner could only speculate

19

that the standard error of measurement would *lower* his IQ score)
(emphasis in original).  Petitioner's IQ could just as likely be 80
as 68.  Significantly for our purposes, petitioner's IQ is more
likely than not above 70.

In addition, there is evidence that measurement error is more of
a factor when only one IQ test is given.  Specifically, Flynn notes
that the possibility of measurement error is "much reduced" when more
than one IQ test is given and the scores corroborate each other.
(*Tethering the Elephant* at 186.)  In this case, petitioner received
a 77 on the WAIS-R administered by Dr. Perri in 1992 and a 79 on the
WAIS-III administered by Dr. King in 2007.  These two scores
corroborate each other, and thus reduce the likely impact of the
standard error of measurement.

It is petitioner's burden to prove, at least by a preponderance
of the evidence, that he has "significantly subaverage intellectual
functioning."   *Hill*, 277 Ga. at 255, 587 S.E. 2d at 618.   Even
applying the Flynn effect, and factoring in the possibility of
measurement error, petitioner has not met that burden.  Accordingly,
the Court finds that he is not mentally retarded under Georgia law.

**B.    Deficits in Adaptive Functioning**

Neither has petitioner proven by a preponderance of the evidence
that his impairments in intellectual functioning have "result[ed] in"
or are "associated with" deficits in adaptive behavior.  *See* O.C.G.A.

20

§ 17-7-131(a)(3).  Even a person with an IQ somewhat lower than 70 is not diagnosed as being mentally retarded unless he has significant deficits or impairment in adaptive functioning.  *Stripling*, 261 Ga. at 4, 401 S.E. 2d at 504.  To satisfy the adaptive functioning prong of the Georgia statute, petitioner must demonstrate significant deficits in at least two of the following areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety.  (Hearing Tr. at 67.)  Petitioner claims that he has deficits in:  functional academics, work, and self-direction. (Petitioner's Br. [88] at 18.)

### 1.  Functional Academics

None of the experts addressed the specific meaning of "functional academics."  If functional academics refers to basic literacy and numeracy skills sufficient to function in the world, the evidence does not support a diagnosis of mental retardation.  Dr. King administered a Wide Range Achievement Test-4 (WRAT-4) to petitioner.  (Respondent's Ex. 1.)  He determined that petitioner possessed adequate literacy skills with some specific difficulty in arithmetic, where he functions below what would ordinarily be expected.  (*Id.*)  Dr. King testified that petitioner knew: Einstein was associated with the Theory of Relativity; the President during the Civil War; the capital of Italy; what is the Koran; and the

21

population of the world.   (Hearing Tr. at 440.)   In Dr. King's
opinion, these were not the responses of a mentally retarded person.
(*Id.*)

In   addition,   standardized   achievement   test   results   in
petitioner's school records indicate that petitioner was reading and
performing mathematics on a fourth grade level when he was in the
fifth grade.  (Petitioner's Ex. 8.)   While petitioner's performance
on these tests was generally below average, it was not two standard
deviations below the norm.   (*Id.*)   Instead, petitioner generally
scored between the 10th and the 20th percentiles, with the exception
of math computation, in which he scored between the 1st and 10th
percentiles, and capitalization and punctuation in which he scored
between the 40th and 70th percentiles.   (*Id.*)

If "functional academics" refers to school performance, however,
petitioner has presented substantial evidence that he functioned
significantly below the norm in this domain.  Several of petitioner's
former teachers testified that petitioner had difficulty doing school
work, even when he tried.  (*See* Petitioner's Exs. 2-3, 5-10.)   They
uniformly testified that petitioner was below grade level in almost
every subject.   (*Id.*)   Petitioner's school records show that he
failed the first grade and the third grade.  (Petitioner's Ex. 16.)
He tried twice to complete the ninth grade, but dropped out both
times because of failing grades.  (*Id.* at Ex. 20; Hearing Tr. at 159,

22

331-36.) Petitioner had particular difficulty with math and reading.[9] (Petitioner's Exs. 3, 5.)  Based on the substantial evidence concerning petitioner's problems functioning in school, the Court will assume that petitioner has demonstrated deficits in the area of functional academics.

    2.  Work

    The evidence concerning petitioner's functioning in the domain of work is much less favorable to petitioner.  On this issue, petitioner presented the testimony of Gordon Wilson and Eddie Cooper, two of petitioner's former employers.  (Hearing Tr. at 119-135.) Wilson owned a greenhouse and landscaping business in Tennga.  (*Id.* at 119.)  Petitioner worked for Wilson, first as a seasonal employee and then on a more permanent basis, when petitioner was in his late teens.  (*Id.* at 124.)  Wilson testified that petitioner's jobs were not skilled and that he had to give petitioner daily assignments and frequent instructions.  (*Id.* at 121.)  However, Wilson stated that petitioner worked hard and that he was a good employee.  (*Id.*)

---

    [9] There is some evidence that suggests that petitioner's failing grades in school resulted from poor attendance and work habits. (Hearing Tr. at 182-83, 369; Petitioner's Ex. 5.)  However, petitioner's teachers testified that he could not work on grade level even when he tried.  (Petitioner's Exs. 2-3, 5-10.)  In addition, that petitioner had difficulty even in the early grades, when attendance was not as much of a problem, suggests that his school performance was at least partially related to his intellectual functioning.

23

Wilson fired petitioner because he became disruptive at work one day. (Hearing Tr. at 122.)

Cooper owns a forestry equipment business. (*Id.* at 129.) He hired petitioner to pressure-wash and clean equipment, perform grounds maintenance, and help in the shop. (*Id.* at 129-130.) Petitioner was around 18 when he worked for Cooper. (*Id.* at 135.) Cooper testified that he did not think petitioner was capable of using the cash register or performing machinery repairs. (*Id.* at 130.) He stated further that petitioner always needed instructions about what to do. (Hearing Tr. at 130.) However, Cooper said that petitioner always took the instructions he was given and did a good job at whatever task he was assigned. (*Id.*) He described petitioner as full of energy and ready to work, and said that he was glad to have petitioner as an employee. (*Id.*)

Petitioner's expert Dr. Feister concluded from the above testimony and other evidence in the record that petitioner had significant deficits in the domain of work. (*Id.* at 154.) She based this conclusion on the fact that petitioner only worked as a "laborer" and that his jobs required minimal skills such as counting reels, threading materials, loading lumber, digging and mowing, pumping gas, nailing shingles and similar activities. (*Id.* at 155.)

That petitioner worked as a "laborer" and had mostly simple jobs does not demonstrate significant deficits in the domain of work. On

24

this point, it is important to remember that petitioner was incarcerated when he was 21 years old. A substantial number of people, particularly people in their late teens, have simple jobs. Most of the evidence in the record and all of the evidence at the hearing suggests that petitioner started working at a young age and that he was able to perform a variety of jobs. (Hearing Tr. at 196.) He was a hard worker and for the most part a valued employee. (*Id.* at 121, 130.) This evidence suggests that petitioner functioned at least in the low-average range at work.

Dr. Fiester also found it significant that petitioner did not maintain any particular job for a long period of time and that he did not experience any career advancement. (*Id.* at 156-157.) Dr. Fiester opined that petitioner's inability to "stay with" a job for any length of time indicated deficits in the work domain. (*Id.*) She testified that a person without work deficits "might be more likely [to] have a job for a longer period of time, and if they had a job for a period of time, there would be some advancement in the job." (*Id.*)

Petitioner's failure to maintain a particular job for a long period of time or to achieve career advancement does not demonstrate significant deficits in the work domain when compared to people in their late teens. In addition, the evidence in the record suggests that petitioner's inability to keep a job was more a function of his

25

AO 72A
(Rev.8/82)

drug and alcohol abuse than his intellectual functioning. (Hearing Tr. at 373.) Dr. Feister stated in her pre-hearing affidavit that petitioner "suffered severe consequences of his alcohol and substance dependency, including . . . job loss." (*Id.*) Dr. Herendeen similarly noted in his 1992 evaluation "that [petitioner] would usually work on a job long enough to get a paycheck and then he would get drunk or 'messed up' and he would lose that job." (Respondent's Ex. 48.) Dr. Zimmermann also conceded that petitioner was consuming a lot of alcohol and marijuana on a daily basis by the age of 16 or 17, which could interfere with his work performance and ability to hold a job. (Hearing Tr. at 373-74.)

The Court recognizes that a mentally retarded person can abuse drugs and alcohol, and that drug and alcohol abusers can be retarded. (*See* Petitioner's Reply [95] at 23.) But the Georgia statute requires petitioner to demonstrate adaptive deficits that "result from" or are "associated with" subaverage intellectual functioning. O.C.G.A. § 17-7-131(a)(3). Petitioner therefore has the burden of proving that his deficits are related to his intellectual functioning, and not his drug and alcohol abuse. He has not met that burden.

### 3.   Self-Direction

The only evidence concerning petitioner's deficits in this area is Dr. Feister's testimony that petitioner had "no long-term job, no

real goals, and no direction." (Hearing Tr. at 161.) She further testified that he did minimal planning and was mostly a "follower." (*Id.*) He did not save money, but lived day-to-day or week-to-week. (*Id.*)

It bears repeating that petitioner was 21 years old when he was incarcerated. Dr. Fiester conceded that it is not uncommon for a person this age to lack goals or a long-term job. (*Id.* at 200.) Neither it is uncommon for a teenager to be unable to save money. Dr. Fiester's testimony is simply insufficient to establish significant deficits in the area of self-direction.

    4.    Standardized Measures of Adaptive Functioning

Finally, the Court addresses the evidence in the record concerning petitioner's performance on two standardized measures of adaptive functioning. Dr. King administered the Adaptive Behavior Assessment System (ABAS) to petitioner. (Respondent's Ex. 1.) Dr. Tasse testified that the ABAS is a well accepted instrument, although he noted that it should be complemented with corroborating information. (Hearing Tr. at 68.) Dr. King's results on the ABAS placed petitioner in the low-average range of functioning, which corresponds with petitioner's IQ scores. (Respondent's Ex. 1; Hearing Tr. at 571.) Dr. King concluded that petitioner did not have the requisite adaptive functioning deficits to be diagnosed as mentally retarded. (Hearing Tr. at 571.)

AO 72A
(Rev.8/82)

Dr. Zimmermann administered the Vineland, another standard measure of adaptive functioning, to petitioner's sister in 2007. (*Id.* at 363-64.)   Petitioner's sister informed Dr. Zimmermann that petitioner:   never participated in non-school sports, never went to evening non-school events with friends without supervision, never showed interest in the activities of others, never had a preferred friend of either sex, never cared for his hair without being reminded and without assistance, never used a stove or microwave oven for cooking, never performed routine household repairs and maintenance tasks without being asked, never looked both ways when crossing the street, never put clean clothes away without assistance, never attended school more than fifteen minutes, and never spoke in full sentences.   (*Id.* at 391-405.)   Based on these responses, Dr. Zimmermann concluded that petitioner had significant deficits in the areas of social skills, self-direction, functional academics, work, and safety.   (*Id.* at 326.)

Dr. Zimmermann conceded that the above responses conflicted with evidence in the record establishing that petitioner:   enjoyed deer hunting and fishing, had lots of friends and socially consumed drugs and alcohol with friends, taught his sister to play pinball, pool, and skateboard, had male friends and a girlfriend with whom he had a child, has consistently been noted to be well-groomed, cooked and took care of himself, did laundry and the dishes, cleaned the house,

AO 72A
(Rev.8/82)

fixed his grandmother's roof, fixed plumbing, attended school and could read and write, had a driver's license and traveled to work on his own.    (*Id.* at 393-405.)    When confronted with these discrepancies, Dr. Zimmermann simply stated: "That's what was reported to me" or "that's what I was told." (Hearing Tr. at 393-402.)

In fact, Dr. Zimmermann ultimately acknowledged that petitioner's scores on various areas of the Vineland conflicted with the evidence in the record and with what petitioner reported to him. (*Id.* at 403-04.)    To provide one example, Dr. Zimmermann gave petitioner a score of 23 in the communication domain.    (*Id.* at 388-89.) Dr. Zimmermann stated that a score of 23 indicates a person who is "barely functioning." (*Id.*) Dr. King noted that this score would represent someone who is functioning as a two-year old.    (*Id.* at 570.)  This characterization is wildly out of line with petitioner's demonstrated communication skills. (*See* Petitioner's Exs. 2-3, 5-10; Hearing Tr. at 119-135, 571.)

Because of its numerous conflicts with all of the other evidence in the record, the Court finds that the Vineland that Dr. Zimmermann administered is not a reliable or valid assessment of petitioner's adaptive functioning.    The evidence instead supports Dr. King's finding that petitioner functions in the low-average range. (Hearing Tr. at 571.)    That is, petitioner has some deficits in adaptive

29

functioning, but those deficits are not significant enough to support a diagnosis of mental retardation.  For this additional reason, the Court finds that petitioner is not mentally retarded under Georgia law.

### CONCLUSION

After reviewing all of the evidence in the record, and the parties' post-hearing briefs, the Court concludes that petitioner has not proven by a preponderance of the evidence that he meets Georgia's definition of "mentally retarded."  Petitioner therefore cannot establish beyond a reasonable doubt that he is mentally retarded. This finding precludes petitioner's *Atkins* claim, as well as his ineffective assistance of counsel claim based on trial counsel's failure to investigate or present a mental retardation claim.  *See Hall v. Head,* 310 F.3d 683, 691 (11th Cir. 2002) (noting that the Court may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied).

SO ORDERED, this _18_ day of March, 2008.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

30

AO 72A
(Rev.8/82)