IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

J.W. LEDFORD, JR.,

    Petitioner,

v.

FREDRICK HEAD, Warden, Georgia
Diagnostic and Classification
Prison,

    Respondent.

CIVIL ACTION NO.

1:02-cv-1515-JEC

**ORDER AND OPINION**

    Petitioner, a prisoner currently under sentence of death by the State of Georgia, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254.  One of the issues raised in the habeas petition is petitioner's claim that he is mentally retarded and is therefore not subject to execution.  After three days of hearings and an exhaustive review of the record and extensive briefing, the Court entered an order on March 19, 2008 concluding that petitioner is not mentally retarded under Georgia law.[1]  (Order

---

[1] After issuance of this order, the Court issued a second order identifying those claims of Petitioner's that were procedurally defaulted. ([99].)  The Court directed the parties to brief the merits of Petitioner's remaining claims.

Following completion of the parties' briefing of the merits of the remaining claims, the Court issued an order noting that the

[96] and Hearing Tr. [80], [83] and [84].)

Petitioner has now filed a motion for reconsideration based on recent developments in the case law and in other authorities since the Court entered its Order. (Pet'r's Mot. to Reconsider [122].)  As a result of those developments, petitioner urges the Court to revisit its conclusion that he is not mentally retarded. (*Id*.) Specifically, petitioner contends that the Court should, in accordance with intervening decisions and authorities, adjust his IQ scores downward to account for the "Flynn Effect" and the standard error of measurement ("SEM"). (*Id*. at 3-13.)  Petitioner further argues that the Court should re-evaluate the evidence of petitioner's impairment in the areas of work and self-direction. (*Id.* at 13-18.)

---

Eleventh Circuit had recently issued a decision that held unconstitutional Georgia's statutory requirement that mental retardation be proved beyond a reasonable doubt by a capital criminal defendant; the Court directed further briefing. ([111].)  The parties jointly requested that the Court stay any briefing until the Eleventh Circuit could determine whether it would rehear *en banc* the above decision: *Hill v. Schofield*, 608 F.3d 1272 (11th Cir. 2010) and, if it did, until a final ruling in the case. ([112].)

The Eleventh Circuit did grant an *en banc* rehearing and ultimately determined that the Georgia requirement that a capital defendant prove his mental retardation beyond a reasonable doubt was constitutional. *Hill v. Humphrey,* 662 F.3d 1335 (11th Cir. 2011)(en banc).  The State notified the Court on September 6, 2012 that the United States Supreme Court had denied petitioner Hill's petition for certiorari and his subsequent motion for rehearing. ([117])  The parties have filed several briefs on the merits of the remaining claims.

Having carefully considered the recent authorities cited by petitioner, the Court finds that reconsideration is unwarranted. Accordingly, petitioner's motion [122] is **DENIED**.

## BACKGROUND

Georgia prohibited the execution of mentally retarded criminals in 1988. *See* O.C.G.A. § 17-7-131(j).  The Supreme Court subsequently held that execution of the mentally retarded constitutes cruel and unusual punishment, in violation of the Eighth Amendment. *Atkins v. Virginia,* 536 U.S. 304 (2002). The *Atkins* decision has been deemed retroactively applicable to cases on collateral review. *In re Holladay,* 331 F.3d 1169, 1172 (11th Cir. 2003).

Under *Atkins,* federal courts must look to state law to determine whether a criminal is mentally retarded. *Holladay v. Allen,* 555 F.3d 1346, 1353 (11th Cir. 2009). In Georgia, the essential features of mental retardation are: (1) significantly subaverage general intellectual functioning, (2) resulting in impairments in adaptive behavior, and (3) manifesting during the developmental period. O.C.G.A. § 17-7-131(a)(3). The Georgia Supreme Court has explained that:

> "Significantly subaverage intellectual functioning" is generally defined as an IQ of 70 or below. However, an IQ test score of 70 or below is not conclusive. At best, an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate. Moreover, persons "with IQs somewhat lower than 70" are not diagnosed as being mentally retarded if

3

>there "are no significant deficits or impairment in adaptive functioning."

*Stripling v. State,* 261 Ga. 1, 4 (1991)(internal citations omitted). Georgia law requires a criminal to prove mental retardation beyond a reasonable doubt. *See* O.C.G.A. § 17-7-131(c)(3) and *Hill v. Humphrey,* 662 F.3d 1335, 1360 (11th Cir. 2011)(holding that Georgia's reasonable doubt standard for proving mental retardation is constitutional).

Prior to petitioner's capital trial, a court-appointed expert determined that he had a "borderline" IQ in the 70 to 80 range. (Order [96] at 2.) Despite this information, petitioner's trial and appellate attorneys never explored whether petitioner was mentally retarded and thus ineligible for the death penalty under Georgia law. (*Id.*) The state habeas court subsequently excluded evidence concerning, and otherwise ignored, petitioner's claim that he was retarded and that his attorneys were ineffective for failing to look into the issue. (Order [38] at 3.) This Court accordingly found that an evidentiary hearing was warranted on the mental retardation issue. (*Id.* at 16.) The purpose of the hearing was to provide petitioner with an opportunity to demonstrate that he was retarded. (*Id.*)

After a three-day hearing and extensive briefing, the Court credited two of petitioner's six IQ scores: (1) his score of 79 on

4

the WAIS-III test administered by Dr. King in 2007 and (2) his score of 77 on the WAIS-R test administered by Dr. Perri in 1992.[2] (Order [96] at 12-14.) Both scores are above the generally-accepted benchmark score of 70 for establishing "significantly subaverage intellectual functioning" as required by Georgia law. *See Stripling,* 261 Ga. at 4. However, petitioner argued that the scores should be reduced to account for the "Flynn Effect" and to compensate for a five-point SEM. (*Id.* at 15-20.)

The Court discussed the Flynn Effect and the SEM at length in its prior Order. (*Id.*) Briefly, the Flynn Effect is a theory positing that because collective intelligence increases over time, the scores on older tests should be reduced so that the test result is an accurate comparison to current norms. (*Id.* at 15-16.) The SEM merely refers to the statistical range that a test result normally represents such that an IQ test result of, for example, 100 indicates that the test taker has an IQ somewhere in the range of 95-105.[3] (*Id.* at 19.) According to petitioner, the SEM mandates a benchmark of 75 rather than 70 for showing the first prong of mental retardation, a

---

[2] Petitioner does not seek reconsideration of the Court's determination that the results of the other four IQ tests that he took were unreliable.

[3] An extremely detailed discussion of the SEM appears in *United States v. Wilson,* 922 F. Supp. 2d 334, 345-49 (E.D.N.Y. 2013).

range that can be achieved in this case if the Flynn Effect is applied to reduce petitioner's test scores by four points each.

As explained in the previous Order, the Court did not apply the Flynn Effect because the phenomenon is not used in clinical practice and the Court was "hesitant to apply a theory that is used solely for the purpose of lowering IQ scores in a death penalty context." (Order [96] at 17.)  In addition, there was some evidence that the Flynn Effect was not as pronounced on the WAIS-III, one of the tests that was used in this case.  (*Id.*)  Further, the Court did not undertake to adjust petitioner's test results to account for the SEM because such an adjustment could result either in higher or lower scores, and the Court found that error was less likely given petitioner's two corroborating scores.  (*Id.* at 19-20.)  In his motion to reconsider, petitioner points to several recent cases where courts have applied the Flynn Effect to reduce IQ scores and/or used a threshold of 75 to account for the SEM.  (Pet'r's Mot. to Reconsider [122] at 4-13.)

On the second prong of the inquiry, the Court assumed in its Order that petitioner had demonstrated significant deficits in the area of functional academics. (Order [96] at 23.)  However, based on the evidence presented at the hearing and in the briefing, the Court concluded that petitioner had failed to show any other adaptive impairments that were related to his intellectual functioning. (*Id.*

6

at 23-30.)  In his motion to reconsider, petitioner cites cases in which the courts found sufficient adaptive deficits to support mental retardation based on evidence that petitioner claims is similar to what he presented in this case. (Pet'r's Mot. to Reconsider [122] at 13-18.)

### DISCUSSION

I. **The Flynn Effect and the SEM**

Based on the citations in his brief, the Court assumes that petitioner seeks reconsideration on account of an "intervening change in the controlling law." *Delaware Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1383 (11th Cir. 2010). Having reviewed the cited cases, the Court still is not convinced that it should apply the Flynn Effect to reduce petitioner's IQ scores. Although it appears that a Flynn adjustment is gaining traction with some courts, other courts have continued to reject the practice. *See Harris v. Thaler,* 464 Fed. App'x 301, 307-08 (5th Cir. 2012)(noting that the Texas courts and the Fifth Circuit have declined to apply the Flynn Effect).  The Eleventh Circuit has held that it is not clearly erroneous to apply a Flynn adjustment, but has not mandated its application and has noted that "there is no uniform consensus regarding the application of the Flynn effect in determining a capital offender's intellectual functioning." *Thomas v. Allen*, 607 F.3d 749, 758 (11th Cir. 2010).

7

Given the prevailing uncertainty in the law, the Court remains "hesitant to apply a theory that is used solely for the purpose of lowering IQ scores in a death penalty context." (Order [96] at 17.) Moreover, the cases cited by petitioner do not address the specific problems with the Flynn theory that became apparent during the testimony at the hearing. For example, the 0.3 point per year reduction requested by petitioner is not supported by Flynn's data pertaining to the WAIS-III, one of the tests on which petitioner's mental retardation claim is based. (*Id*. at 17-18.) Nevertheless, based on the recent cases cited by petitioner and for the purposes of this discussion, the Court is willing to investigate whether application of the Flynn Effect to petitioner's IQ scores would have a material impact on the ultimate issue of whether petitioner is mentally retarded.

Applying the Flynn Effect and giving the full four point reduction requested, Petitioner has credible IQ scores of 73 and 75. (*Id.* at 18.) These scores are still above the score of 70 that is generally considered to demonstrate "significantly subaverage" intellectual functioning under Georgia law. *See Stripling*, 261 Ga. at 4. Whether the Court applies the Flynn adjustment is thus only material if the Court also changes the benchmark score for "significantly subaverage" from the 70 IQ score relied upon in the Order to the 75 IQ score urged on the Court by petitioner. According

8

to petitioner, that change is warranted to account for the SEM and is supported by recent case law. (Pet'r's Mot. to Reconsider [122] at 11-13.)

The Court acknowledges that some states, and the federal courts within those states, have set the benchmark for "significantly subaverage" intellectual functioning at an IQ score of 75. *See Brumfield v. Cain,* 854 F. Supp. 2d 366, 389 (M.D. La. 2012) ("consistent with Louisiana statutory and case law, an IQ score of 75 or below does not preclude a finding of mild mental retardation") and *United States v. Davis,* 611 F. Supp. 2d 472 (D. Md. 2009)(using a score of 75 as the benchmark for mental retardation). However, the Court is required by *Atkins* to determine whether petitioner is mentally retarded under Georgia law. *Holladay v. Allen,* 555 F.3d 1346, 1353 (11th Cir. 2009). As discussed above, Georgia generally uses "an IQ of 70 or below" as the cutoff for establishing mental retardation. *Stripling,* 261 Ga. at 4. And in Georgia, even an IQ score that is at or below 70 is "not conclusive" evidence of mental retardation in the absence of deficits or impairment in adaptive function. *Id.*

Moreover, and as noted in the previous Order, the SEM merely provides a range within which petitioner's IQ *might* be somewhat higher or lower than the score he achieved. (Order [96] at 19-20.) Applying the SEM, petitioner's IQ is just as likely to be five points

9

higher than his Flynn adjusted scores of 73 and 75 as it is to be five points lower. That is, petitioner's IQ is just as likely to be 78 or 80 rather than 68 or 70. Particularly given petitioner's burden under Georgia law of proving mental retardation beyond a reasonable doubt, there is no basis for assuming on account of the SEM that petitioner's intellectual functioning is "significantly subaverage."

Finally, the Court heard and credited evidence at the hearing that the potential for measurement error is "much reduced" when more than one IQ test is given and the scores corroborate each other. (*Id.* at 20.) That is the case here, where Petitioner received a 77 on the WAIS-R administered by Dr. Perri in 1992 and a 79 on the WAIS-III administered by Dr. King in 2007. (*Id.*) For all of these reasons, the Court concludes that petitioner's IQ scores exceed Georgia's threshold for establishing mental retardation, even after applying the Flynn Effect.

## II. Deficits in Adaptive Functioning

To satisfy the adaptive functioning prong of the Georgia statute, petitioner must demonstrate significant deficits in at least two of the following areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety. (*Id.* at 21.) In his briefing and at the hearing, petitioner

claimed deficits in functional academics, work, and self-direction. (*Id*.)  The Court presumed an academic deficit based on petitioner's school records and other evidence concerning his problems functioning in school.  (Order [96] at 23.)  However, the Court found insufficient evidence to show a significant deficit in the areas of work or self-direction.  (*Id*. at 23-30.)

In his motion to reconsider, petitioner points to several cases that he says warrant reconsideration of the Court's ruling on the adaptive functioning prong. (Pet'r's Mot. to Reconsider [122] at 13-18.)  According to petitioner, the courts in these cases found adaptive deficits in work or self-direction based on evidence similar to that presented by petitioner.  (*Id*.)  The problem with this argument is that an adaptive deficit determination is necessarily based on an investigation of the facts specific to the particular individual.  *See Thomas,* 607 F.3d at 758-60 (reviewing the district court's highly individualized adaptive deficit finding) and *Hill v. Schofield,* 608 F.3d 1272, 1280 (11th Cir. 2010), *vacated* 625 F.3d 1313 and later *rev'd* 662 F.3d 1335 on other grounds, (noting the "purely qualitative" nature of the inquiry).  Even where a case involves similar facts, the weight accorded to those facts will differ under the circumstances of the particular case.  For example in the *Thomas* case cited by petitioner, the defendant Kenneth Thomas had a work history arguably similar to that of petitioner's.  *Thomas,*

11

607 F.3d at 758. However, Thomas was older when he was incarcerated for his crimes, and there was very little discussion of drug and alcohol use by Thomas – two factors that significantly informed the Court's decision that petitioner had failed to demonstrate an adaptive deficit in the area of work.

Nevertheless, the Court has reviewed the transcript from the hearing in light of the case law cited by petitioner. As a result of that review, the Court remains confident in its adaptive deficit ruling. Without doubt, petitioner was not a highly accomplished individual before his incarceration. However, petitioner's own witnesses described him as a "good employee" who did a "good job at whatever task he was assigned," who was "full of energy and ready to work," and who was a valued employee. (Order [96] at 23-24.) As to the area of self-direction, the evidence established that petitioner

> enjoyed deer hunting and fishing, had lots of friends and socially consumed drugs and alcohol with friends, taught his sister to play pinball, pool, and skateboard, had male friends and a girlfriend with whom he had a child, has consistently been noted to be well-groomed, cooked and took care of himself, did laundry and the dishes, cleaned the house, fixed his grandmother's roof, fixed plumbing, attended school and could read and write, had a driver's license and traveled to work on his own.

(*Id.* at 28-29.) The case law cited by petitioner does not alter the Court's perception of the evidence presented in this case, nor the Court's ultimate conclusion that petitioner failed to meet his burden of proving that he has adaptive deficits in two or more of the

12

relevant areas.

### III. Conclusion

For the above reasons, the Court **DENIES** petitioner's Motion for Reconsideration [122].  The Court is aware that the Supreme Court has recently granted certiorari in a case that potentially implicates the SEM issue discussed above.  *See Hall v. Florida,* 134 S. Ct. 471 (Oct. 21, 2013).  The question presented in *Hall* is whether Florida's bright-line requirement of an IQ score of 70 or below to establish mental retardation, in conjunction with its failure to account for the SEM, violates *Atkins v. Virginia*.  *Br. for Petitioner* at 1-2, *Hall v. Florida*, 134 S. Ct. 471 (No. 12-10882), 2013 WL 6917377 at *1 (Dec. 19, 2013).  The Supreme Court will hear arguments in *Hall v. Florida* on March 3, 3014.

It is unclear whether the Supreme Court's decision in *Hall* will affect the outcome in this case because (1) this Court did not apply a bright-line IQ score cut-off of 70, but rather considered all of the evidence to determine that petitioner did not demonstrate "significantly sub-average" intellectual functioning, (2) as a factual matter, the SEM is less significant a factor in this case because of petitioner's corroborating results on two separate IQ tests, and (3) petitioner failed to meet his burden of proving that he has adaptive deficits in two or more of the relevant areas.  Nevertheless, the parties will be permitted to file motions to

13

reconsider out-of-time on the basis of *Hall,* should those motions appear necessary or warranted.

In the meantime, the parties should prepare the case for final disposition on the other issues raised by the habeas petition. Petitioner should file his final brief, and any supplemental materials that he deems necessary for the Court to issue a final decision, by **Friday, March 21, 2014**.  Respondent should file its response by **Friday, April 11, 2014.**[4]

SO ORDERED, this 26th day of February, 2014.

/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] If Petitioner or Respondent wish to rely on their previous briefing, they may certainly do so.  It would be helpful, however, if the parties cite any Eleventh Circuit or Supreme Court authority issued since their last substantive briefing that could have an impact on any issues in this case.

14